ATLANTIC COAST LINE R. CO. et al. v. MACON GROCERY CO. et al.

(Circuit Court of Appeals, Fifth Circuit. January 5, 1909.)

No. 1,854.

1. COURTS (§ 272*)—FEDERAL COURTS—JURISDICTION—VENUE.

A bill to obtain an injunction against various interstate carriers, who were nonresidents of the district, to restrain them from putting into effect an advance of rates for carriage of commodities in interstate commerce through a large area embracing parts of several different states, charging that the carriers were members of a freight association organized and maintained under agreements to constitute an illegal combination in restraint of trade and fostering a monopoly, etc., presented for necessary consideration the proper construction of the federal interstate commerce act, so that the court's jurisdiction did not rest solely on diversity of citizenship of the parties, and hence the federal Circuit Court in the district of complainants' residence had no jurisdiction to compel the defendants to answer over their objection.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 811; Dec. Dig. § 272.*]

2. COMMERCE (§ 89*)—INTERSTATE COMMERCE COMMISSION—JURISDICTION OF COURTS PENDING PROCEEDINGS.

The Interstate Commerce Commission having been given exclusive jurisdiction in the first instance to determine the reasonableness of interstate rates by Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1907, p. 892]), shippers cannot maintain a suit in equity to prevent the filing or enforcement of a schedule of rates, or a change to unjust or unreasonable rates, pending determination of the reasonableness thereof by the Commission.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*

Jurisdiction of federal courts of suits under interstate commerce act, see note to Bailey v. Mosher, 11 C. C. A. 318.]

Shelby, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern District of Georgia.

For opinion below, see 163 Fed. 738.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Jno. L. Tye, Henry L. Stone, Claude Waller, Sanders McDaniel, R. C. Alston, Ed Baxter, W. E. Kay, and C. B. Northrop, for appellants.

William A. Wimbish, Edgar Watkins, and Alex. Akerman, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. On July 25, 1908, the appellees, the Macon Grocery Company and other domestic corporations in the state of Georgia, and certain partnerships and individuals having their principal places of business in the Southern district of Georgia and domiciled therein, and all alleging themselves to be citizens of that state, engaged as wholesale dealers in groceries, food products, and like commodities, exhibited to one of the judges of the Circuit Court of the Southern District of Georgia their bill of complaint against the appellants, the Atlantic Coast Line Railroad Company, a corporation and citizen of the state of Virginia, the Louisville & Nashville Railroad Company, a corporation and citizen of the state of Kentucky, the Nashville, Chattanooga & St. Louis Railway, a corporation and citizen of the state of Tennessee, the Southern Railway Company, a corporation and citizen of the state of Virginia, and the Cincinnati, New Orleans & Texas Pacific Railway Company, a corporation and citizen of the state of Ohio, and applied for and obtained from the judge an order whereby the appellants were required to be and appear before him at a time and place named in the order to show cause why an injunction pendente lite should not be granted as prayed for in the bill; and, in the meantime and until the further order of the court, were temporarily restrained from putting into effect the advance in freight rates, referred to in the bill, to be made effective August 1, 1908, in so far as all points in the state of Georgia are concerned.

In their bill the appellees allege, in substance, that the appellants are common carriers by railroad engaged in the transportation of interstate commerce, including grain and grain products, hay, and meats, from Ohio and Mississippi river crossings, Nashville, Tenn., and related points, to points in Southeastern territory, including the state of Georgia: that each of the appellants is a member of the Southeastern Freight Association, which, appellees, allege, was organized and is maintained under agreements and for purposes which constitute an illegal combination in restraint of interstate trade, and for fostering monopoly in the destruction of fair competition among carriers engaged in such trade; that the appellants the Atlantic Coast Line Railroad Company and the Nashville, Chattanooga & St. Louis Railway form a part of the Louisville & Nashville Railroad System, and the appellant Cincinnati, New Orleans & Texas Pacific Railway Company forms a part of the Southern Railway System; that these two systems have continuous lines from said crossings to Southeastern destinations and are natural competitors, so that any combination, agreement, or understanding between them whereby rates are advanced and maintained is in suppression of competition; that during the

year 1904 there was discontent with the railroad rates of freight from both Eastern and Western points of origin to Atlanta and related points, which included Macon and other cities in Georgia, but after conferences in the latter part of that year were held certain reductions were accorded by the railway companies in the rates on classes B, C, D, and F, flour in sacks, fresh meats, C. L., from said crossings to Atlanta and other points related, effective February 1, 1905, which rates, as reduced, were reasonable and had been since maintained; that in June, 1908, a concerted movement was begun looking to an increase in the rates on said classes and commodities from and to said points; that it was recognized that each of said two systems must unite in any such proposed increase, and, to accomplish the purpose, the intervention of the said association was sought and employed; that a declaration was filed with said association by the appellants the Louisville & Nashville Railroad Company, the Atlantic Coast Line Railroad Company, and the Southern Railway Company, composing said systems, announcing that on August 1, 1908, they would make effective certain advances in the rates, as set out in the bill, on classes B, C, D, and F, fresh meats, C. L., grain, grain products, hay, and packing-house products, from said crossings, Nashville, Tenn., and points with relation thereto, to Southeastern points; that the Central of Georgia Railway Company (which is not sued) also joined in such declaration, which was communicated by the chairman of said association to each of the lines of railroad interested, in the form of a circular; that the concurrence of action on the part of said two systems suppressed competition and forced all connecting carriers either to concur in the advances or give up the traffic, and such connecting carriers did concur therein, acting through the agency of said association; that subsequently the Louisville & Nashville Railroad System and the Southern Railway System filed with the Interstate Commerce Commission their freight tariffs embodying said advances, and gave notice that the new tariffs would become effective on August 1, 1908; that in each of these tariffs practically every interested line joined as a participating carrier, a list of such participating lines numbering 73, including each of the appellants, being shown on page 2 of these tariffs. The alleged method employed by the railway companies in advancing rates through the medium of said association is set out in the bill; and it is further alleged in the bill that the territory of said Southeastern Freight Association may be roughly described as the states of South Carolina, Florida, Georgia, and that portion of Alabama east of a line drawn from Chattanooga through Birmingham, Selma, and Montgomery to Pensacola; that the territory west of that line and east of the Mississippi river, embracing Mississippi and parts of Louisiana and Alabama, comes within the dominion of another like association called the Southeastern Mississippi Valley Association; that the states of Tennessee and Kentucky, including said crossings, are either embraced in the last-mentioned association, or in some other association bearing a similar relation to the Southeastern Freight Association; that the territory north of the Ohio river and west of the Mississippi river is dominated by similar traffic associations; that the

advance in rates complained of, effective August 1, 1908, was the outcome of understandings and agreements in suppression of competition and an unlawful combination in restraint of interstate trade, arrived at and made effective through the agency of the Southeastern Freight Association and other affiliated associations, and the acts of such combination in advancing rates was the result of a conspiracy which is unlawful at common law and under the statutes of the United States; that the proposed advance was upon commodities of prime utility and daily necessity, and entitled to as low a rate as may be consistent with a fair return to the carrier for the transportation service performed; that said advance would disturb existing trade relations, causing loss to appellees and injury to the consuming public; that the commodities upon which the rates were to be advanced were of such necessity, and the supply from other sources was so limited, that considerable traffic would continue to move, even under the alleged exorbitant and unjust rates represented by the advance, but the effect of the increased rates would inevitably restrict the volume of the traffic, reduce the business of the appellees and other dealers, and deprive the consuming public, or some part thereof, of the ability to purchase and use said commodities to the extent to which they are entitled, to the irreparable loss and injury of the appellees and others similarly situated, and to the prejudice of the public interest; that appellees' legal remedy was inadequate for the loss and damage resulting to them from the exaction of unjust and unreasonable rates, and the consequent restriction of their business was a constantly recurring grievance incapable of pecuniary estimation; that should the advance be ascertained and declared to be unjust and unreasonable and reparation be allowed, not only would such remedy be inadequate to compensate for the loss and damage suffered, but the enforcement of the right of reparation or of the right to threefold damages authorized under the Sherman anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) would result in a multiplicity of suits; that under the reduced rates effective February 1, 1905, traffic moved freely and the carriers prospered until the coming about of the abnormal conditions following the financial panic of October and November, 1907; that for some months thereafter the volume of railway traffic greatly declined, resulting in a loss to the carriers of both gross and net earnings; that this loss was attributable to a decrease in the volume of all traffic, but appellees believed it to be true that the decline in other traffic was much greater than in the commodities on which the proposed advance in rates applied; that not only were the carriers injuriously affected by the panic, but all lines and classes of business and industries suffered loss; that the net earnings of the appellants and other carriers in recent months had shown an advance, and there existed a reasonable expectation that net earnings of appellants and other carriers would continue to increase and normal conditions would be restored; that the carriers had no right to take advantage of an abnormal condition, which in its nature was transitory, in order to make advances in rates upon com-

modities of utility and necessity, when the preceding rates had been shown to be compensatory under normal conditions.

Appellees further averred they were remediless under the strict rules of the common law, and could obtain relief only in a court of equity, and prayed for a rule against appellants to show cause why an injunction pendente lite should not be issued; that, in the meantime, appellants be temporarily restrained from putting into effect the proposed increase in rates to be made effective August 1, 1908, from said crossings and Nashville and related points to all points within the state of Georgia affected by said advance; and that, on a final hearing, the court enter a decree perpetuating such injunction.

At the time and place named in the rule, each of the appellants entered a special appearance for the purpose of pleading to the jurisdiction of the court over the person of such appellant, and for no other purpose, and each filed its plea to the jurisdiction of the court, stating in substance, that it was not at the institution of the suit, nor then, a corporation organized or existing under the laws of the state of Georgia, or a citizen or inhabitant of that state, nor an inhabitant or resident of the Southern district of Georgia, but was, at the time of the institution of the suit, and was then, a corporation organized and existing under the laws of the state named in the plea, and a citizen of such state, and an inhabitant of a certain district therein where its corporate meetings are held and its corporate business transacted; that this suit is a civil suit, wherein the jurisdiction is not founded only on the fact that the action is between citizens of different states, but is based also upon acts of Congress of the United States relating to interstate commerce, and alleged causes of action thereunder, and each of the appellants insisted upon its exemption from suit in that court, and claimed that the Circuit Court of the United States for the district of which it was an inhabitant, if any court, had jurisdiction of such appellant, and prayed hence to be dismissed.

The appellees demurred to these pleas, and for cause of demurrer averred that the controversy presented by the bill is wholly between citizens of different states, and is solely founded upon diversity of citizenship.

The court sustained appellees' demurrers, and overruled appellants' pleas.

Thereupon the appellants, without waiving their pleas, but still relying and insisting on them, filed their joint demurrer to the bill, specifying numerous grounds not necessary to be here set out, all of which the court disregarded, and proceeded to hear the application for injunction and the affidavits and documents offered in support of it. The appellants offered no counter affidavits or evidence, but stood on their demurrers and pleas. Thereafter the judge made the following order:

"The above-entitled cause came on to be heard on July 29, 1908, on the rule issued against the defendants to show cause why an injunction pendente lite should not be granted.

"Defendants, and each of them, appeared specially and objected to the jurisdiction of the court over the persons of the defendants; and the court being of the opinion that the court did have jurisdiction over the persons of

the defendants in this cause, and so announcing, thereupon the defendants, and each of them, filed a joint and several demurrer, and presented the same as cause in law why the relief prayed should not be granted.

"Thereupon proof was submitted in behalf of complainants in support of the averments of their bill, and the cause was argued by counsel for the respective parties.

"At the conclusion of the hearing on July 30, 1908, the court took the matter under advisement until August 1, 1908, when the opinion of the court was handed down sustaining the contention of the complainants, and directing an issuance of the injunction prayed for upon the condition that complainants should within ten days present their complaint to the Interstate Commerce Commission for investigation and determination of the reasonableness of the rates involved.

"And it appearing that the complainants, together with other persons in the cities of Atlanta, Columbus, Rome, and Athens, Ga., have this day filed with the Interstate Commerce Commission their complaint praying the Commission to investigate and determine the reasonableness of the rates involved, also to declare what are just and reasonable maximum rates:

"The court being now fully advised in the premises, it is thereupon considered, ordered, and decreed as follows, to wit:

"That the defendants, the Atlantic Coast Line Railroad Company, the Louisville & Nashville Railroad Company, Nashville, Chattanooga & St. Louis Railway, Southern Railway Company and Cincinnati, New Orleans & Texas Pacific Railway Company, and each of them, be and they are hereby jointly and severally enjoined from enforcing collection of the advance in rates made effective August 1, 1908, from Ohio and Mississippi river crossings. Nashville, Tenn., and points with relation thereto, to all points within the state of Georgia, on classes B, C, D, and F, fresh meats, C. L., grain products, hay, and packing-house products; this injunction to continue and remain in force pending an investigation and determination of the reasonableness of the rates involved, by the Interstate Commerce Commission, or until further order of the court.

"Dated and signed this August 3, 1908."

Thereupon this appeal was taken.

The substance of the numerous specifications of error assigned is that the court below in this suit had no jurisdiction over the persons of the appellants, and had no jurisdiction of the subject-matter.

It is unnecessary to quote the familiar language of the statute now in force providing in what districts parties may be sued in the Circuit Court. It seems to be conceded by the appellees, at least, we think, it cannot be controverted, that their right to sue in the district of their residence must rest upon the ground that the controversy presented by their bill is wholly between citizens of different states and is solely founded upon diversity of citizenship. There is no dispute as to the controversy being between citizens of different states. Whether it is solely founded upon diversity of citizenship leads to such a consideration of the subject-matter of their bill and an inquiry as to the jurisdiction of the Circuit Court to entertain the bill at all as will answer the question as to the liability of appellants to be sued out of the district of their residence. The object of the bill was to obtain an injunction against the appellants from putting into effect an advance of rates for carriage of commodities in the conduct of interstate commerce throughout a large area, embracing parts of several different states. They charge that the appellants are common carriers by railroad engaged in the transportation of interstate commerce, including the commodities on which advanced rates are proposed to be charged; that

the appellants are members of the Southeastern Freight Association, which, they allege, was organized and is maintained under agreements and for purposes which constitute an illegal combination in restraint of interstate trade, and for fostering monopoly in the destruction of fair competition among carriers engaged in such trade; that certain of the appellants form a part of the Louisville & Nashville Railroad System, and others of them, the Southern Railway System; that these two systems have continuous lines so located that they are natural competitors; that certain rates resulting from a conference between shippers and carriers and becoming effective February 1, 1905, were reasonable and had been maintained from that date; that in June, 1908, a concerted movement was begun to increase the rates on the classes and commodities named from and to Eastern and Western points to Atlanta and other points related; that the two systems above named recognized that they must unite in any such proposed increase, and to accomplish the purpose the intervention of the Southeastern Freight Association was employed, giving the details of proceedings between the appellants and that association which resulted in the two systems named filing with the Interstate Commerce Commission their freight tariffs, embodying the advance complained of, and giving notice that the new tariff would become effective on August 1, 1908. Without extending this second reference to the allegations of the bill, it seems clear to us that the proceedings which the appellees asked the Circuit Court to conduct would constitute a large share in the work of regulating commerce.

In the organization of our government the Congress was given power to regulate interstate commerce. As commerce was then conducted upon public waters and public roads, the free competition between carriers, with rare exceptions, adequately regulated rates for carriage. When railroads began to be constructed and articles of commerce carried thereon, their operation for many years was confined to the state in which each originated and to the carrying of intrastate commerce, subject to the regulations of their respective states. When, however, the intrastate lines began to be linked up into interstate lines, and commercial dealings so extended that interstate commerce acquired controlling magnitude, efforts began to be made to get Congress to exercise its power of regulating rates and other features of railroad carriage engaged in interstate commerce. The jealousy of the states and the opposition of the carriers prevented the passage of any general act until 1887, when the act to regulate commerce went into effect. It was the initial step in the public policy which has ever since challenged the attention of political, commercial, and industrial leaders. Much contrariety of thought was evolved in the effort to apply and enforce its various provisions. The administrative tribunal, as first ordained, established, and empowered, proved inadequate to the task of exercising the necessary control of the railroad carriers. The powers of this tribunal have been increased by successive amendments of the original act, and statutory rules and penalties for their infraction have been laid upon the carriers until we have the law now in force. It requires every common carrier, subject to its provisions,

to file with the Interstate Commerce Commission, and print and keep open to public inspection, schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, pipe line, or by water, when a through route and joint rate have been established (Act June 29, 1906, c. 3591, § 6, 34 Stat. 586 [U. S. Comp. St. Supp. 1907, p. 896]), and provides that no change shall be made in the rates, fares, and charges, or joint rates, fares, and charges, which have been so filed and published, except after 30 days' notice to the Commission and to the public, which shall plainly state the changes proposed to be made in the schedules then in force, and the time when the changes will go into effect; provided, the Commissioners may modify the requirements of this section. The several parties, when parties to a joint tariff, shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the Commission such evidence of concurrence therein or acceptance thereof as may be required or approved by the Commission; and, where such evidence of concurrence or acceptance is filed, it shall not be necessary for the carriers filing the same to file copies of the tariff in which they are named as parties. In the case at bar 73 participating carriers, in the manner required, filed their concurrence and acceptance of the tariffs proposed to be made effective.

Section 8 (Act Feb. 4, 1887, c. 104, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3159]) provides that the carriers violating any of the provisions of the act shall be liable to the person or persons injured to the full amount of damages sustained in consequence of such violation, together with a reasonable counsel or attorney's fee.

Section 9 provides that persons claiming to be damaged may make their complaint either to the Commission in the manner provided in the act, or by bringing suit on their own behalf for the recovery of damages for which such carrier may be liable under the provisions of the act in any District or Circuit Court of competent jurisdiction; and such persons shall not have the right to pursue both of these remedies, and must elect which of the two methods of procedure herein provided for they will adopt. This does not warrant the conclusion that it was the purpose of Congress to confer power upon courts primarily to relieve from the duty of enforcing the established rate by finding that the same, as to particular persons, was so unreasonable as to be unlawful, and to prevent its enforcement by injunction. Texas & P. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 441, 442, 27 Sup. Ct. 350, 51 L. Ed. 553.

Section 10 provides severe penalties for violations of the act by carriers.

Section 12 provides that the Commission have authority to inquire into the business of all common carriers subject to the provisions of the act, and keep itself informed as to the manner and method in which the same is conducted, specifying elaborately the means it may use to acquire that information.

Section 13 provides how and by whom complaints may be made to the Commission, and how served upon carriers, and if the carriers

shall not satisfy the complaint within a specified time, and there appear to be any reasonable ground for investigation thereof, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper; and no complaint shall at any time be dismissed because of the absence of direct damage to the complainant.

Section 14 (amended by Act June 29, 1906, c. 3591, § 3, 34 Stat. 589 [U. S. Comp. St. Supp. 1907, p. 899]) provides that, when such an investigation shall be made by the Commission, it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the Commission, together with its decision, order, or requirement in the premises.

Section 15 (amended by section 4, 34 Stat. 589 [U. S. Comp. St. Supp. 1907, p. 900]) provides that the Commission is authorized and empowered, and it shall be its duty, whenever, after full hearing upon a complaint made as provided in section 13 of this act, or upon complaint of any common carrier, it shall be of the opinion that any of the rates or charges then demanded, charged, or collected by any common carrier or carriers, subject to the provisions of this act, for the transportation of persons or property as defined in the first section of this act, or that any regulations or practices whatsoever of any carrier or carriers affecting such rates are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this act, to determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged, and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed, and to make an order that the carrier shall cease and desist from such violation, to the extent to which the Commission find the same to exist, and shall not thereafter publish, demand, or collect any rate or charge for such transportation in excess of the maximum rate or charge so prescribed, and shall conform to the regulation or practice so prescribed.

Section 16 (amended by section 5, 34 Stat. 590 [U. S. Comp. St. Supp. 1907, p. 902]) provides that if, after hearing on a complaint made as provided in section 13 of the act, the Commission shall determine that any party complaining is entitled to an award of damages under the provisions thereof, the Commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named. If the carrier does not comply with this order, the person for whose benefit such order was made may file in the Circuit Court of the United States in the district in which he resides, or in which is located the principal operating office of the carrier, or through which the road of the carrier runs, a petition setting forth briefly the causes for which he claims damages, and the order of the Commission in the premises. Such suit shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the Commission shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for the costs in the Circuit Court or costs at

subsequent stage of proceedings unless they accrue upon his appeal. If the petitioner shall finally prevail, he shall be allowed a reasonable attorney's fee to be taxed and collected as a part of the costs of the suit. If any carrier fails or neglects to obey any order of the Commission, other than for the payment of money, while the same is in effect, any party injured thereby, or the Commission in its own name, may apply to the Circuit Court in the district where such carrier has its principal operating office, or in which the violation or disobedience of such order shall happen, for an enforcement of such order. Such application shall be by petition, which shall state the substance of the order and the respect in which the carrier has failed of obedience, and shall be served upon the carrier in such manner as the court may direct, and the court shall prosecute such inquiries and make such investigations through such means as it shall deem needful to the facts in issue or which may arise upon the hearing of such petition. If, upon such hearing as the court may determine to be necessary, it appears that the order was regularly made and duly served, and that the carrier is in disobedience of same, the court shall enforce the obedience to such order by writ of injunction, or other process, mandatory or otherwise, to restrain such carrier, its officers, agents, or representatives, from further disobedience of such order, or to enjoin upon it, or them, obedience to the same; and in the enforcement of such process the court shall have those powers ordinarily exercised by it in compelling obedience to its writs of injunction and mandamus. From any action upon such petition an appeal shall lie by either party to the Supreme Court of the United States, and in such court the cause shall have priority in hearing and determination over all other causes, except criminal causes, but such appeal shall not vacate or suspend the order appealed from.

Section 16a (amended by section 6, 34 Stat. 592 [U. S. Comp. St. Supp. 1907, p. 906]) provides that, after a decision, order, or requirement has been made by the Commission in any proceeding, any party thereto may at any time make application for rehearing of the same, or any matter determined therein, and it shall be lawful for the Commission in its discretion to grant such rehearing if sufficient reason therefor be made to appear. No such application shall excuse any carrier from complying with or obeying any decision, order, or requirement of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. If, upon such rehearing, it shall appear that the original decision, order, or requirement is in any respect unjust or unwarranted, the Commission may reverse, change, or modify the same accordingly.

There is a provision in section 22 (Act Feb. 4, 1887, c. 104, 24 Stat. 387 [U. S. Comp. St. 1901, p. 3171]) of the act that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute; but the provisions of this act are in addition to such remedies."

In reference to this provision we quote at length the concluding portion of the opinion of the Supreme Court in Texas & Pacific Railway

Company v. Abilene Cotton Oil Company, 204 U. S., our quotation beginning on page 446, 27 Sup. Ct. 358, 51 L. Ed. 553, as follows:

"This clause, however, cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself. The clause is concerned alone with rights recognized in or duties imposed by the act, and the manifest purpose of the provision in question was to make plain the intention that any specific remedy given by the act should be regarded as cumulative, when other appropriate common-law or statutory remedies existed for the redress of the particular grievance or wrong dealt with in the act.

"The proposition that if the statute be construed as depriving courts generally, at the instance of shippers, of the power to grant redress upon the basis that an established rate was unreasonable without previous action by the Commission, great harm will result, is only an argument of inconvenience which assails the wisdom of the legislation or its efficiency, and affords no justification for so interpreting the statute as to destroy it. Even, however, if in any case we were at liberty to depart from the obvious and necessary intent of a statute upon considerations of expediency, we are admonished that the suggestions of expediency here advanced are not shown on this record to be justified. As we have seen, although the act to regulate commerce has been in force for many years, it appears that by judicial exposition and in practical execution it has been interpreted and applied in accordance with the construction which we give it. That the result of such long-continued, uniform construction has not been considered as harmful to the public interests is persuasively demonstrated by the fact that the amendments which have been made to the act have not only not tended to repudiate such construction, but, on the contrary, have had the direct effect of strengthening, and making, if possible, more imperative, the provisions of the act requiring the establishment of rates and the adhesion by both carriers and shippers to the rates as established until set aside in pursuance to the provisions of the act. Thus, by section 1 of the act approved February 19, 1903, commonly known as the 'Elkins Act' (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]), which, although enacted since the shipments in question, is yet illustrative, the willful failure upon the part of any carrier to file and publish 'the tariffs or rates and charges,' as required by the act to regulate commerce and the acts amendatory thereof, 'or strictly to observe such tariffs until changed according to law,' was made a misdemeanor, and it was also made a misdemeanor to offer, grant, give, solicit, accept, or receive any rebate from published rates or other concession or discrimination. And in the closing sentence of section 1 it was provided as follows:

" 'Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereof, or participates in any rates so filed or published, that rate as against such carrier, its officers, or agents in any prosecution begun under this act, shall be conclusively deemed to be the legal rate, and any departure from such rate or any offer to depart therefrom shall be deemed to be an offense under this section of this act.'

"And, by section 3, power was conferred upon the Interstate Commerce Commission to invoke the equitable powers of a Circuit Court of the United States to enforce an observance of the published tariffs.

"Concluding, as we do, that a shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable, it is unnecessary for us to consider whether the court below would have had jurisdiction to afford relief if the right asserted had not been repugnant to the provisions of the act to regulate commerce. It follows, from what we have said, that the court below erred in the construction which it gave to the act to regulate commerce."

The Abilene Case was begun and proceeded to final judgment in the state court, but no account of this condition was taken in the judgment and opinion of the Supreme Court, and all the reasoning of the opinion against the jurisdiction of the court which rendered the judgment then under review applies, we think, at least with equal force against the jurisdiction of the Circuit Court in such cases, and with greater force against the original exercise of equitable jurisdiction by injunction or otherwise, to interrupt the order of rate-making as elaborately and imperatively prescribed by the statute, or to supplement the specific and ample remedies prescribed by the act.

It has been suggested that the later case of Southern Railway Co. v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, indicates that the authority and reasoning in the Abilene Case is not fully applicable to the case at bar. The original bill in the Tift Case was filed April 11, 1903, and a temporary restraining order was issued. On May 8th the bill was amended. The defendants appeared and filed a demurrer to the amended bill for want of jurisdiction in the court as a court of equity and as a court of the United States, but made no objection on the ground that they were not liable to suit in that district. The demurrer was overruled, but the temporary injunction was dissolved. The appellants in that case took the steps prescribed by the interstate commerce act to put the advanced rates into effect, and the appellees, on June 23, 1903, filed a petition before the Interstate Commerce Commission charging that, in promulgating the tariff of increased rates and maintaining and enforcing the same, the appellants were acting in concert with each other and with other lumber-carrying roads, who with them were co-members of the Southeastern Freight Association. The carriers appeared before the Commission and filed a joint and several answer, in which they traversed the allegations of the petition and pleaded justification by the conditions affecting the roads and the traffic. A great deal of testimony was taken on the issues presented, and the Commission found and concluded that the advance in rates was not warranted by the testimony, and that the increased rates put in force June 22, 1903, were unreasonable and unjust. Pending the proceedings before the Commission, complainants in the original bill filed an amended bill and again moved the Circuit Court for an injunction. This motion for injunction was dismissed. The Commission made its order on the 7th of February, 1905, and on March 17, 1905, the complainants in the original bill presented a petition to the Circuit Court stating the substance of the findings of the Commission and attaching a copy of its report and opinion. Then another order to show cause was issued, and on June 3, 1905, the parties cited to show cause appeared and answered. Complainants filed a supplemental bill, the purpose of which was to obtain restitution of excess of rates charged over those which were alleged to be unreasonable. By stipulation between the parties the testimony taken before the Interstate Commerce Commission was filed in the Circuit Court, subject only to objections to its relevancy. In addition to that testimony, other evidence was submitted to the Circuit Court, and that court, after these proceedings, rendered a decree July 5th that the

advance in rates, etc., was excessive, unreasonable, and unjust and in violation of the act of Congress known as the "Act to Regulate Commerce," and the amendments thereto, and that the rates and charges resulting from said advance were likewise excessive, unreasonable, and unjust and in violation of the act. The decree also directed an order of reference to the standing master of the pleadings and evidence in the cause, with instructions to ascertain the sum total of the increase in rates paid by each of the complainants and other members of the Georgia Sawmill Association to either or all of the defendant carriers since the rate went into effect. This decree was affirmed by this court. The original bill, it will be noticed, was filed in the Tift Case before June 29, 1906, the date of the passage of what is popularly called the "Hepburn Act." The opinion of the Supreme Court calls attention to the fact that the Circuit Court granted no relief prejudicial to the carriers on the original bill. It sent the parties to the Interstate Commerce Commission, where, upon sufficient pleadings identical with those before the court, and upon testimony adduced upon issues made, the decision was adverse to the carriers. This action of the Commission, with its findings and conclusions, was presented to the Circuit Court, and it was upon this, in effect, that the decree of the court was rendered. There was no demurrer to that petition, and the testimony taken before the Commission was stipulated in the case, and the opinion of the trial court recites that with equal meritorious purpose counsel for the respective parties agreed that this would stand for and be the hearing for final decree in equity. It is true the opinion of the Supreme Court does use this language, in speaking of the Abilene Case:

"We are not required to say, however, that because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates."

As that question was not before them, they were not required to pass upon it, and did not.

We are clear in our conviction that there is nothing in the Tift Case to support the jurisdiction of the Circuit Court in entertaining the bill exhibited by the appellees in this case, and because we find nothing in the numerous decisions of the Supreme Court which we have examined to weaken the conviction we have expressed that the reasoning which is convincing and controlling against the entertaining of an action at law for damages occasioned by the enforcement of unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, for a stronger reason, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of rates, or a change to unjust or unreasonable rates, it is also forbidden by the interstate commerce act, because it would work an incalculably greater mischief.

We conclude that the bill in this case presents for necessary consideration the proper construction of the act to regulate commerce, and, therefore, the jurisdiction of the court does not rest solely upon

the diversity of the citizenship of the parties. We conclude that the sound construction of the different provisions of the act to regulate commerce as amended and now in force necessarily forbids the exercise of the jurisdiction attempted to be invoked by the bill in this case.

It follows that the decree appealed from must be reversed, and the cause remanded to the Circuit Court with instruction to dismiss the bill without prejudice.

PARDEE, Circuit Judge (concurring). I fully concur in the opinion prepared by Judge McCORMICK and the conclusion reached thereunder, because:

First. I doubt if the lower court had jurisdiction ratione personæ.

Second. The complainants have other full and adequate remedies through the Interstate Commerce Commission.

Third. The effect of an injunction in this case would be to throw the interstate rates of the whole Southeastern territory into disorder and confusion, resulting in greater evils than those suggested and alleged in the present bill.

Fourth. The initial regulation of interstate rates is placed by law in the hands of the Interstate Commerce Commission, and the courts should not interfere to restrain, compel, or regulate, except when invoked after final action by the Commission and in accordance with the rules prescribed in the laws regulating interstate commerce.

It is not necessary to amplify these views further than is done in Judge McCORMICK'S lucid statement of the case.

SHELBY, Circuit Judge (dissenting). As I understand the opinion just read, it is held that the Circuit Court has no jurisdiction of the case made by the bill, for the reason that it is deprived of jurisdiction by a "sound construction of the different provisions of the act to regulate commerce." Section 22 (Act Feb. 4, 1887, c. 104, 24 Stat. 387 [U. S. Comp. St. 1901, p. 3171]) of the act provides that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." The words "common law" are here used in contradistinction to "statute law." When so used, they include those doctrines of equity jurisprudence which have not been expressed in legislative enactments. The phrase "remedies now existing at common law or by statute" includes all existing remedies. Remedies existing by statute may be either legal or equitable, and remedies existing at common law—that is, remedies that have not been expressed by legislative enactment—may be either legal or equitable. 2 Words & Phrases Judicially Defined, 1329, and authorities there cited. A bill in equity to enjoin a wrong causing irreparable injury is a remedy at common law, in the sense that it existed in England, independent of statute, before the organization of this government, and exists in this country independent of statute. It is true that, although this remedy by bill is expressly reserved by the act, it would not continue to exist if its exercise "would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S.

226, 246, 27 Sup. Ct. 350, 51 L. Ed. 553. The equitable remedy asserted in this case is not necessarily in conflict with the act. The just purposes of the act are promoted, not crippled, by leaving intact the equitable remedies preventive of irreparable injury and a multiplicity of suits. This case does not, in my opinion, come within the rule or principle of the Abilene Case. The Supreme Court has said that it is not, by the authority of that case, required to say "that, because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden·by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates." Southern Ry. Co. v. Tift, 206 U. S. 428, 437, 27 Sup. Ct. 709, 51 L. Ed. 1124. The act does not, I think, deprive the Circuit Court of jurisdiction when facts are alleged showing that the equitable remedy is necessary to prevent irreparable injury and a multiplicity of suits.

The clause of the act reserving remedies should not be disregarded except as to remedies that would defeat the operation and enforcement of the act—remedies that are absolutely inconsistent with the act. The remedy sought in this case, and the procedure thus far, as the record shows, are in harmony with the purposes of the act. The cases that have been decided since the decision of the Abilene·Case show that the rule there announced does not abrogate the clause quoted from· section 22 of the act, nor destroy the preventive jurisdiction of courts of equity; and that such jurisdiction may be exercised without in any way ·invading the domain of the Interstate Commerce Commission. Southern Railway Co. v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124; Northern Pacific Railway Co. et al. v. Pacific Coast Lumber Manufacturers' Ass'n et al. (C. C. A.) 165 Fed. 1; M. C. Kiser Co. v. Central of Georgia Ry. Co. (C. C.) 158 Fed. 193; Jewett Bros. & Jewett v. Chicago, M. & St. P. Ry. Co. (C. C.) 156 Fed. 160.

I cannot concur in the decree dismissing the bill for want of jurisdiction of the subject-matter of the suit.